File No. 25-1292, In Re. Mobileye Global Securities. Thank you. Attorney Rizzio-Hamilton. Good morning, Your Honors. John Rizzio-Hamilton, Bernstein, Litowitz, Berger, and Grossman for the Plaintiff's Appellants. This is securities class action that the district court dismissed on a single ground, the failure to plead a misleading statement or omission. On de novo review, this court should reverse. The complaint alleges a channel-stuffing scheme that rendered several of defendants' statements misleading half-truths within the meaning of this court's recent decision in Hain, which the district court did not have the benefit of at the time of its dismissal. For instance, defendants told investors during the class period that their Tier 1 customers have so much capacity to buy more IQ chips when, in fact, Mobileye had already forced its customers to take millions more IQ chips than they could sell through. I want to just poke at that a little bit. Sure. The statement wasn't they have so much capacity to buy our chips. It was the context of that was a discussion about the long term and the ability of Mobileye to stay competitive. And Mobileye was talking about how much more cost-efficient its units were. And in that discussion, it said they need to super-cost optimize. Our Tier 1s have so much capacity to buy cameras, put them into housings, take our chip, put them onto the PCB and deliver them to the end user that we think our ecosystem is a cost leader significantly. So we feel comfortable with our share. Now, that is a very general statement. It's about the long term. It was not a statement that at this moment they have excess capacity to buy our chips. Respectfully, Your Honor, I disagree. Here's why. The speaker here was asked about the company's market share and ability to maintain that market share. And what he said was that he felt very comfortable about the company's ability to maintain its market share precisely because the current customers had at the time a lot of capacity to continue buying from the company. Can you say where it says the current capacities at the time? I mean, the question was over the next several years. Can you sustain your market share over the next several years? Where in the answer do they talk about immediate capacity? The now. Yeah. So the answer by its terms refers to the now. He says, and our Tier 1s have so much capacity to buy cameras. He doesn't say we anticipate that in the future they will continue to have so much capacity or we anticipate in the future they may have so much capacity. He's saying we have the ability to maintain our current market share going forward precisely because our Tier 1s, as we sit here today, have a lot of capacity to buy our chips. The existence of the yearly commitments had already been announced, correct? Everyone was aware of their existence. Everyone was aware of their existence. And, Your Honor, I think this question goes really to the heart of the district court's dismissal order. The district court's thesis was that the disclosure of those annual commitments coupled with them. Repeated disclosure. True. But what Haynes. There's no financial result, not result. You're not arguing that any of the disclosed information was inaccurate, correct? The results were not inaccurate. Is that right? That's correct. Sorry. Okay. No problem. So two responses there. And Haynes is directly on point with respect to both issues. So the district court held in sum and substance that the disclosure of the annual commitments coupled with one or two other disclosures in the company's SEC filings informed the market adequately of all material facts such that it could not be misled. What Haynes tells us about that is that that is the truth on the market defense, and we argued this below, that really should not be accepted as a matter of law at the pleading stage because it raises intensely fact-specific issues as to what the market fully understood. And here there's three reasons why this court on de novo review shouldn't credit that truth on the market defense under Haynes. First of all, the disclosures at issue did not disclose several critical facts. The first is that while they did disclose the existence of the minimum commitment contracts, they did not disclose that those contracts were in fact being used by Mobileye as an instrument to force their customers over the customer's objection to take millions more chips than they could sell through. That's number one. It didn't disclose that. Number two, it didn't disclose what the minimum commitments actually were, so the market couldn't assess and come to its own view of whether the commitment exceeded organic demand. Number three, they didn't even disclose which chips the commitments applied to, and the company had two chips, although admittedly the IQ accounted for the vast majority of its sales. But the goal of these disclosures is to put people on notice. And there's a point at which, you know, there's two chips, I get that. Yeah. But there's only two. There's not 50. Right. And so a potential investor or a current investor could ask the question, right? And so it's the same thing with how many contracts. We know it's three tier one customers. Like we know they've disclosed it's three of their tier one customers that have these contracts. That's a fair amount of information. I guess my question is how much more do you really believe that is required as a matter of law every time to be sufficient? So here, I'd like to directly answer your question and then point to some market commentary which shows us that the disclosures were not adequate. Well, now I'm going to ask you about market commentary and whether we can take that in this case. But go ahead. Okay. So what they should have disclosed is that they were using these contracts to force customers over their objection to take more chips than they believed they could sell through, and that that was going to have a material impact on the company's financial performance, which it did. Was there any allegation that at the time the buyers entered into the minimum commitment contracts, they were compelled to commit to a level that was higher than at that time they thought they needed? I do see allegations that as the market changed, they wanted to reduce their purchases, and the company said no. But I'm wondering this notion that the company forced them to commit to more than they wanted to commit to. Tell me about that. So there's no specific allegation that at the time they entered into these deals, the customers told Mobileye that this is more than we wanted. What there are are substantial allegations from both FE1 and FE2, which reported quite clearly that they were being forced under the terms of these contracts to take more than they wanted and to take more than they could sell through, and they provided FE1 says this specifically. They were enforcing the minimum contract obligations. Right. Well, but they were enforcing them in a way that was misleading to the market and created a deceptive impression. How? Because it created the impression that the company's sales naturally were organically meeting high analyst expectations that the company had cultivated throughout the class period, when in fact, as we specifically allege, without the forced excess sales, they would not have met those analyst expectations. And this does bring us to the market reaction that Your Honor touched upon. This is a case where you don't have to take my word for whether the disclosures were accurate enough. You can look at contemporaneous analyst commentary, of which there are two kinds that is very important to this assessment. The first is from October 2023. Let me stop you for just a moment and go back a half a tick. To what extent are we supposed to be concerned with analysts' reactions as opposed to what the disclosures or the misrepresentations actually were? And then you can make your own. Yeah. So I think that analyst reaction is highly significant, precisely because these are very sophisticated outfits. We're talking about Morgan Stanley, Bank of America, Canaccord, whose job is to follow the company's disclosures and report on the company's performance. So they tell you a lot about what the entire context of the disclosure, not just the SEC filings, because you must consider what the company said on conference calls. They said the inventory situation was stable. They said that they have so much capacity to take our chips. They said that our revenue is being driven by volume and average sales price. They said that any excess inventory concerns were fleeting and driven by customer choice, which was not true. The analysts listened to all that. The analysts compute all that together. And here they came to two very significant conclusions that bear directly on whether these disclosures were adequate. They cannot be ignored. The first is that in October of 2023, after these SEC filing disclosures we're talking about had been in the market repeatedly, Canaccord says that all the destocking headwinds following, you know, the COVID-induced inventory problems are largely behind the company, and here's the critical part, in line with management commentary. Canaccord had been listening to management for months, if not years, and said that the commentary put them at ease, that there was no inventory issue. Okay, but one of the disclosed facts is that we expect our Tier 1 customers will utilize accrued inventory on hand before placing new orders to meet the demand of the end users in current or future periods. As a result, some demand for our solutions and the corresponding revenue from these customers were shifted to earlier time periods than otherwise would have occurred absent a general supply chain shortage and inflationary environment. We cannot predict when the impact of these factors on global vehicle production will substantially diminish. Isn't that a pretty direct notice of exactly the effect that came to bear? No, for two reasons, to directly answer your question. The first is that it blames the inventory problem on COVID-induced supply chain issues when, in fact, this was Mobileye forcing its customers to take these ships when it didn't want them. No, no, but you've just said there's no allegation that when the customers committed to those contracts, that they committed at a level that was higher than they wanted. So there's actually no allegation that it's not true that they, in earlier time periods, committed to greater purchases than they ultimately needed because of the whatever causes, supply chain issues. What it doesn't disclose is that the company is continuing to force them to take on more than they want. And even though the supply chain issues are resolved, and by the way, this is precisely the issue that the Canaccord report addressed and said, based on the management commentary we've heard, these are largely behind the company. Now, second, and there's another very important category of analyst commentary here, it's after the disclosures in January. We have multiple sophisticated analysts saying that the company gave no notice of any building inventory issues. So I'm mindful that we're going to get to hear from you again. Yeah. So why don't we take a break and go to Attorney Sessions. Thank you. Thank you. Thank you, Your Honor. I may just need a moment to lower the camera. I'm a little bit more vertically challenged than my colleague. Some of us are familiar with that. It tends to happen sometimes. Okay. May it please the Court, Dana Sessions, Davis, Polk & Wardwell, LLP, on behalf of defendants. Sort of to pick up where the Court's questions were, this is a case where literally there is nothing more that Mobileye was obligated to disclose or could have disclosed during the relevant time period with respect to either its minimum commitment contracts or excess inventory. As Mobileye's disclosures made clear, and as the district court recounted in its thorough and well-reasoned opinion that we submit this Court should affirm on appeal, Mobileye disclosed from the time it went public in October 2022 and throughout the class period the key components of this so-called channel stuffing scheme. For starters, there were supply chain challenges that were causing difficulties in the semiconductor industry. I want you to be able to tell us what the disclosures were. But if your point is the disclosures were complete and accurate, how do you account for the reaction of the analysts that Mr. Rizzio-Hamilton said were so sophisticated? So two points in response. It does look like they were surprised. Fair enough, Your Honor. Two points in response. I think first is a legal point, which is that is hindsight pleading, and there are no allegations contemporaneous with the timing of when these disclosures were made to suggest that they in any way were false or there was contradictory information. And I think that stands in stark contrast with the numerous cases on which plaintiffs' appellants rely where there is a record of falsity as determined and established by a slew of confidential witnesses, detailed information, what customers were saying, and the like. That's Densley, that's SolarEdge, and that's Hain, which Mr. Rizzio-Hamilton identified. I think the other piece, though, Your Honor, to address your question is the following. Because mobilized disclosures were complete and accurate, in our view, during the course of the class period, they disclosed, as Judge Robinson identified, that there was excess inventory that customers were accruing. What they didn't, what they learned at late 2023 and disclosed in early 2024 was the extent of it in excess of what they had seen previously. So when they learned that it was significantly more, the $6 million to $8 million, what did they do? They went to the market. They didn't even wait until they had a disclosure, an earnings call or a disclosure obligation. They preannounced because it was different than what they had seen previously and what they had known. And so all throughout the class period, they have notified the market. They have told the market, this is what our customers are doing. When they learned in late 2023 that it was to the extent that it was, they went right out to the market and made that point. So I think the allegations of the complaint would say they had visibility into the buildup of the inventories because everybody uses the same tech products and they're the same customs about visibility to your customers. And so it can't be the case that they were surprised by the extent of the customer's inventory buildup. And that becomes the foundation for the, therefore, it was false or an omission. I do think that is what the plaintiffs' appellants would say. I think we would say in response, those allegations are woefully inadequate. There are no particularized allegations as are required that anyone was sharing with Mobileye. And let's just put a finer point on it. This isn't Mobileye's inventory, right? It's Tier 1. It's customers' inventory. And that is affected by the demand that they are getting from their customers, who are the OEMs. So Mobileye, there's no allegations that Mobileye had visibility into OEM demand to particular customers or that their customers were sharing with Mobileye what that demand looked like, how it compared to what Mobileye was selling to the Tier 1s or any delta between those over a period of time. And if you look at these cases that I've identified, those allegations are specific, they are plentiful, and they come from multiple confidential witnesses who all corroborate one another. That is completely lacking here. And so the other — so I hope that answers your question. But the other point I wanted to note here is, I think from an issuer perspective, we would submit that Mobileye did what you would expect and want an issuer to do in these circumstances. They were upfront about what they were doing. They then, when they learned new information that they felt was important, they went to the market. And as I said, they did it when they didn't even have that obligation. As the Court has identified, there's nothing improper or unlawful about these annual minimum commitment contracts, nor is there anything improper or unlawful about enforcing them in accordance with those terms. So this notion that Mobileye was forcing its customers to purchase the quantities that they were obligated to purchase amounts simply to enforcing the terms. So it's not that it's not channel stuffing. It's that it's not actionable channel stuffing. Well, we would submit that it's actually not channel stuffing. The purpose of this was not to stuff the channels to benefit the company's financial reporting and financial conditions. The purpose of all of this, as the plaintiffs themselves allege, was to counteract the supply chain shortages that were coming out of the COVID-19 pandemic. And so we would submit it's not channel stuffing at all. But channel stuffing in and of itself, and I think the Hain court has said this, is not inherently improper. There's consequences that can flow from it that can be actionable, none of which are present here. And Hain lays out those two scenarios. That's the accounting improprieties, which were plentiful in Hain. No allegations of that here. And then the half-truths, which, for the reasons we're talking about, we submit don't exist here either. I also wanted to respond to a point that Mr. Rizzio-Hamilton made about the continued, the disclosures about the excess inventory where the company allegedly blamed the customers when that wasn't the case. And if one looks at the actual January 4, 2024 disclosure, the company makes clear that this excess inventory has accrued over a period of three years. And they say, based on our discussions, we understand that much of this excess inventory reflects decisions by Tier 1 customers to build inventory in the basic ADAS category due to supply chain constraints in 21 and 2022 and a desire to avoid part shortages, as well as lower-than-expected production at certain OEMs during 2023. And that's significant because 2021 is not an annual commitment year. The annual commitment contract started in 2022. So this had been a buildup over three years of time. 2021 is core COVID supply chain constraints. 2022 is still coming out of that. The annual commitment contracts come into play. And then 2023, they attribute to the slowdown in production at the OEMs. But again, as we talked about previously, there are no allegations. Particularized, well-pled, to be sure, there are none, that Mobileye had visibility into what OEMs were, in turn, purchasing from the Tier 1 customers. A few other points, and then I will quietly take my seat. I think you've already talked about the so-much-capacity statement. I would just make an overarching observation that the purported alleged misstatements in this case are either not subject to any interpretation that renders them false or misleading or are cherry-picked out of context, as the Court has already identified. And so when one looks at those in context, as Judge Cote did, in a very meticulous and thoughtful fashion, there simply are no false or misleading statements here that are actionable. And with that, unless the Court has any other questions, I'll take my seat. Thank you. Thank you. Attorney Rosie Hamilton. Thank you. I'd like to principally address two points. The first is this question of, you know, what was going on at the time these minimum commitments were entered into. There are allegations in the complaint, in paragraphs 70 and 118 of the complaint, that the customers were strong-armed into them by Mobileye's dominant market position and they felt that they had no choice but to enter into these contracts. Well, as to the amount, not just as to the minimum commitment? So it's as to the minimum commitment, but those allegations go on to say that they quickly wanted to adjust down the commitments that they had been forced to agree to, but they couldn't because Mobileye refused to let them. So paragraph 70 — Isn't that simply saying they weren't forcing the commitments that they had entered into and nothing more than that? So on some level, yes, but the problem, Your Honor, arises when the company then goes out and says that we don't have an inventory issue. It's stabilized. The customers have so much capacity. Our revenue is being driven by average sales price or the customers are choosing to take on excess stock from time to time, all of which was untrue. You know, and Hain tells us the underlying issue doesn't have to be illegal in and of itself, but if you have an underlying issue like that, you've got to be careful about what you say to the market, and it doesn't green light you to go out and say that there is no inventory issue, there is additional excess capacity, and that any excess capacity that is existing in the channel is the product of customer choice, when it's absolutely not. The second main point that I'd like to make — From the perspective of the market, why does it matter whether the excess is because they overbought relative to what proved to be their needs in 21 and 22 because they were worried about supply chain issues versus they overbought because they entered into a minimum commitment contract that was at a greater level than proved to meet their needs? In either case, there's a disclosure that they're sitting on more than we anticipate they need to meet prospective demand, and we're going to see a drop-off at some point. Well, there's two reasons. The first is that that disclosure gave the impression that this was something historical that wasn't ongoing, when it absolutely was ongoing throughout the class period to the tune of 2 million more excess chips. So that's number one, and that's important. Number two, that disclosure was mitigated by reassuring statements made on conference calls throughout the class period that really robbed it of any force, and that's why Canaccord reported what it did in October of 2023. That's why all these other analysts reported what they did in January of 2024. Now, my colleague also made the point that there's no well-pled allegation that the company knew that it was forcing chips onto its customers in excess of their actual demand. That is not accurate. Paragraphs 76 and 79 of the complaint, which are former employee reports, specifically say that the company, that A, in paragraph 76, the company could see from the reports it received from the Tier 1 suppliers that there was significant excess inventory across the board. Paragraph 79 specifically says that Aptiv provided Mobileye with forecasts showing that the demand for IQ chips was far below the volume that Mobileye was forcing Aptiv to purchase. How do we – one of the things that's puzzling to me is how does having visibility into the growth of inventory in the customer's accounts tell us anything without also knowing what the drawdown is coming on the downstream demand for those? Yeah, and I think paragraph 79 speaks to that. You know, at regular times throughout the class period, Aptiv gave Mobileye reports of what it expected its drawdown to be over the forthcoming 18 months. And so Mobileye was put on notice of that. And paragraph 76, you know, tells us essentially the same thing, that there was existing overstock relative to the demand that the Tier 1 customers were communicating. And we have a whole section in the complaint devoted to this reporting mechanism that's common in the industry. And, in fact, defendants themselves, defendant Shoshua, for instance, repeatedly said that they were in continuous contact with their Tier 1 customers to match inventory to the demand that the Tier 1s were seeing. And so the complaint does contain ample allegations that Mobileye was definitely put on notice that the amounts it was forcing its customers to buy under these deals exceeded the amounts that they could sell through. And, you know, at the end of the day, I think, you know, Hain is extremely instructive here, both with respect to the main truth on the market issue at the center of the case, as well as with respect to the concept that statements concerning revenue drivers can be misleading, even if the revenue itself is literally accurate, when they omit that a material portion of the revenue is being driven by this kind of activity, which it was here. Appreciate it. Thank you very much, Your Honor.  We appreciate your arguments. We'll take it under advisement.